IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| GUNSTREAM LAND CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>HANS V. HANSEN<br>AND KAREN M. HANSEN,<br>Individually and d/b/a Hansen Construction,<br><br>Defendants. | CIVIL ACTION NO.: 6:21-cv-00451<br><br>**ORIGINAL COMPLAINT** |

## ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff Gunstream Land Corporation ("Gunstream"), brings this action against Defendants Hans V. Hansen and Karen M. Hansen, individually and doing business as Hansen Construction (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1. Fishing is a favorite activity for many Texans. It lends an opportunity to find a quiet place to escape from modern life's hustle and bustle. It is so popular that famed Texas singer-songwriters including Merle Haggard and Robert Earl Keen wrote songs about it.

2. You can find good fishing spots throughout this great State. Prior to the events described below, Gunstream's property contained one of the best fishing spots in Texas.

3. Gunstream was organized in the early 1950s to own and operate real property in Wood County. The property includes two lakes that are rigorously managed for the production of world class largemouth bass. Gunstream's management practices include retaining a fish biologist to monitor fish populations and growth ratios, maintain proper algae bloom for maximum plankton

production, maintain proper water pH, raise tilapia, shad and perch in adjacent brood ponds and to purchase brood fish to maintain an abundant food source for the largemouth bass.

4. Until Defendants' acts and omissions described below, the lakes at Gunstream were some of the best, if not the best, freshwater fishing sites in Texas. Big Lake (defined below) has historically produced double digit numbers of bass caught weighing in excess of 10 pounds, a standard known by many as "lifetime" bass. It took years, and hundreds of thousands of dollars, for Gunstream to develop and maintain the premier freshwater fishing destination in the State.

5. On September 22, 2020, Defendants' man-made dam located upstream from Gunstream's property failed. A wall of water estimated to be up to 20 feet high in places and 100 yards wide in certain spots roared onto Gunstream's property, scouring everything in its path and inflicting catastrophic damage. Mature trees as tall as 60 to 80 feet were felled. Root balls up to 50 feet in circumference were left in the path of the flood. The water swept away natural forest litter accumulated over decades, destabilizing the soils in the channel connecting Defendants' property to Gunstream's property.

6. Gunstream brings this action against Defendants for violations of the Federal Clean Water Act, the Endangered Species Act, negligence per se, negligence, gross negligence, and trespass to real property.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. Additionally, this Court has subject matter jurisdiction over claims arising under the Endangered Species Act pursuant to 15 U.S.C. § 1540(g)(1) and claims arising under the Federal Clean Water Act pursuant to 33 U.S.C. § 1319(b).

8. As set forth in greater detail below, the statutory notice requirements mandating 60-day notice to the alleged violator and appropriate federal agencies prior to suit under the Endangered Species Act and Federal Clean Water Act have been satisfied.

9. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over Defendants because they are citizens and residents of the State of Texas.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants reside in Wood County, Texas, within the Eastern District of Texas, and because a substantial part of the events giving rise to Gunstream's claims occurred in Wood County, Texas.

## PARTIES

12. Plaintiff Gunstream Land Corporation is a registered Texas corporation that has existed since 1954. Originally organized as a hunting and fishing club, Gunstream is now predominantly a fishing club.

13. Defendant Hans V. Hansen is a Texas citizen who resides at 6775 FM 2088, Winnsboro, Texas 75494, and may be served with process at that address or wherever he may be found.

14. Defendant Karen M. Hansen is a Texas citizen who resides at 6775 FM 2088, Winnsboro, Texas 75494, and may be served with process at that address or wherever she may be found.

15. Hans and/or Karen Hansen own and operate a construction business that does business as "Hansen Construction." This business is not registered with the Texas Secretary of State, and it is also not a recorded assumed name in Wood County, Texas. Signs maintained by

the Hansens in the area advertise Hansen Construction as a provider of demolition services, a road construction contractor and, most significantly, a lake construction contractor. UCC filings for construction equipment, including excavators and dozers, list Hans Hansen as the debtor.

## FACTUAL ALLEGATIONS

### The Gunstream Property

16. Gunstream owns approximately 800 acres of contiguous real property in Wood County (the "Gunstream Property"). The Gunstream Property contains two lakes. The largest lake is known as "Big Lake." Big Lake is the premier body of water on the Gunstream Property and the focus of the bass fishing attention of Gunstream's members. A second lake, known as "Little Lake," is north of Big Lake, and is fed by a small tributary called Mill Creek. These lakes are also fed by multiple natural springs in the area.

17. Defendants own two non-contiguous tracts of land in Wood County. One of those tracts is near the Gunstream Property. The tract relevant to Gunstream's claims in this lawsuit is 424.8 acres of real property that sit generally to the east of the Gunstream Property. Defendants' 424.8 acre tract will be hereinafter referred to as "Defendants' Property." Defendants' Property is legally described as Abstract 0103, Candler J M, Tract 28. The physical address for the location of Defendants' Property is 1145 & 1155 FM 2869, Winnsboro, Texas. There is a large spring on Defendants' Property that provides a source of water feeding into a channel that runs from Defendants' Property, through an adjoining tract of property known as the "Hightower Property", and then onto Gunstream's Property to a part of Big Lake known as Mill Pond Cove.

### Defendants Construct a Dam

18. According to Defendants, Hans Hansen and his grandson, Brazos Hightower, began constructing a man-made dam on Defendants' Property in May 2020. Upon information and

belief, however, based on aerial imagery available on the internet, construction of the dam may have begun as early as 2019.  Defendants built the dam for the purpose of creating a lake.  Within a month after the dam was complete, the lake that Defendants created was full.

**Defendants Failed to Take Responsible Steps in Constructing the Dam**

19. There were multiple failures on Defendants' part in constructing the dam.

   *a. Defendants Failed to Engage an Engineer*

20. First, upon information and belief, Defendants did not retain a licensed engineer to design, review, or approve the plans for the dam. Indeed, it appears Defendants did not have appropriate construction plans for the design and construction of the dam.

   *b. Defendants Failed to Obtain Necessary Approvals to Build Dam*

21. Second, upon information and belief, Defendants did not obtain permits from any local, state, or federal agency or authority to construct the dam.

22. Specifically, the Texas Commission on Environmental Quality ("TCEQ") has a dam safety program that required a safety permit due to the size of the dam and lake being constructed. Upon information and belief, Defendants did not submit an application to TCEQ for such a permit or seek an exemption from the permitting requirement.  Further, upon information and belief, Defendants did not obtain a permit or an exemption from TCEQ to build the dam.

23. Had Defendants approached TCEQ, upon information and belief TCEQ would have required Defendants to have a construction plan that was prepared and stamped by a licensed professional engineer before any construction could begin.

24. Additionally, Defendants' Property contains flowing springs that continuously feed an area of Defendants' Property that, upon information and belief, would be defined as "wetlands"

under the Federal Clean Water Act. Such wetlands are within the jurisdiction of the U.S. Army Corps of Engineers. In other words, upon information and belief, the channel running from the spring on Defendants' Property, including the area where Defendants constructed the dam, is subject to the Federal Clean Water Act.

25.     In order to construct a dam on land that is within the jurisdiction of the Federal Clean Water Act, Defendants were required to have a study conducted to determine the impact, if any, of the dam on the wetlands. Defendants did not have the requisite study conducted before building the dam. Had a proper study been performed, Defendants would have discovered that they needed to apply for, and obtain, a "404 permit" from the U.S. Army Corps of Engineers in order to construct the dam.

26.     Defendants never obtained a 404 permit. In fact, upon information and belief, Defendants never applied for a 404 permit. Had Defendants applied for a 404 permit, the U.S. Army Corps of Engineers would have likely required a licensed professional engineer to be involved in the design and construction of the dam to ensure that it would not fail under normal conditions.[1]

27.     Defendants' Property also provides a viable habitat for at least three non-migratory bird species protected under the Endangered Species Act: (1) the Least Tern; (2) the Piping Plover; and (3) the Red Knot.

28.     Because of the potential presence of these species, Defendants were also required to have a study conducted to determine whether any of these species of birds were actually present

---

[1] As detailed below, the U.S. Army Corps of Engineers has since issued a cease and desist letter to Defendants regarding the dam.

on Defendants' Property.  If the study determined any of these species were present, Defendants were required to apply for, and obtain, approval from the U.S. Fish and Wildlife Service and the U.S. Environmental Protection Agency prior to constructing the dam.

29. Upon information and belief, Defendants did not perform any study to determine whether any of these species were present on their property.  Defendants also did not obtain approval from these federal agencies prior to constructing the dam.  Further, upon information and belief, Defendants never sought approval from these federal agencies prior to constructing the dam.  Had Defendants done so, these federal agencies would have required Defendants to take steps to ensure that the dam would not improperly impact the habitats of these species, or any other endangered species downstream, or to mitigate against such impacts.

### c. *Defendants Failed to Properly Construct the Dam*

30. Third, Defendants failed to properly construct the dam.

31. Before constructing a dam an analysis must be conducted in order to understand the geological implications and the potential or likely flow paths of the impounded water once the dam is complete. There are also components involved in the construction of a dam to ensure structural integrity. For instance, a pipe or pipes are installed at the base that go through the core of the dam.  A siphon or siphons are also generally constructed over the top of the dam to draw water levels down at a controlled rate. The siphon is also a pipe. The Siphon, along with a concrete spillway or rip-rap, is incorporated into the dam to ensure that water moves from the ponded side to the downstream side of the dam in a controlled fashion. An emergency spillway must also be constructed to help control the water level in the event of a more intense rainfall event when the siphon is insufficient. The emergency spillway is also constructed with concrete or rip-rap. In sum,

constructing a dam requires using the correct materials and the proper placement and construction of structures, including the pipes and related construction and materials. While Defendants apparently attempted to incorporate at least some of these structures in their dam, they did so in a manner that failed to prevent the problems that led to the failure of the dam.

32. Upon information and belief, Defendants did not import appropriate soil or fill material to give the dam adequate structural integrity.

33. A core trench is a basic component of a properly built dam. Conversely, the lack of a core trench is a frequent cause of dam leakage and/or failure. Upon information and belief, Defendants did not build a core trench and did not build the embankment for the dam using lifts (layers) to assure adequate compaction.

34. Additionally, upon information and belief, Defendants failed to take adequate steps to compact the embankment on the dam.

35. Further, upon information and belief, Defendants did not use proper construction techniques for the pipe at the base, the siphon or the spillway, thereby undermining the structural integrity of the dam.

### d. *Defendants Failed to Take Precautions following Construction*

36. Fourth, after finishing their inadequate construction, Defendants realized they had a structural problem. While Defendants brought in man-made materials such as hay bales and other controls (such as netting and sediment logs) to try to support the dam, they failed to take adequate precautions after the dam was built to protect it against a known risk of failure. Upon information and belief, Defendants did not take adequate steps to mitigate against underflow beneath the dam, such as by installing a toe drain. Further, upon information and belief,

Defendants did not seek the assistance of someone with the requisite expertise in constructing or supporting man-made dams.

**The Dam Fails**

37. Between May and September 2020, there were no particularly significant rain events at or near the Gunstream Property or the Defendants' Property.

38. Nonetheless, on September 22, 2020, Defendants' dam failed, causing catastrophic volumes of water and debris, including forest litter, mud and timber to flood the Gunstream Property and inundate Big Lake. This caused extensive damage to the Gunstream Property, including the fishing habitat in Big Lake.

39. Gunstream immediately began efforts to assess and remediate the damage in Big Lake. Gunstream closed members' access to Big Lake from September 22, 2020 to January 8, 2021.

40. The dam failure, and consequential silt, sediment and debris that washed onto the Gunstream Property and into Big Lake, caused the fish population in Big Lake not to produce a fall shad spawn. It is unclear whether the bass population in Big Lake will reproduce in future years. Until the ecosystem in Big Lake is restored to its pre-incident conditions, Big Lake will not be able to support fish spawns and fish growth as it has in the past. Thus, the quality and quantity of fish in Big Lake will remain less than what it was before Defendants' dam failed.

41. In addition to restoring the ecosystem of Big Lake, Gunstream will also need to perform habitat restoration inside Mill Pond Cove, including removal of silt and mud, replacement of aquatic vegetation and replacement of fish habitat and structure, such as brush piles and contours. Gunstream will also need to perform a shoreline restoration and stabilization of Mill

Pond Cove. This will involve planting of new shoreline vegetation, and re-sculpting the shoreline index that was destroyed as a result of the dam failure.

42. Estimates secured so far indicated it will cost more than $1.5 million to take all known necessary steps to try to restore Big Lake and stabilize the channel.

43. In addition to the loss of use of Big Lake, Gunstream has suffered diminution in the value of the Gunstream Property. For instance, Gunstream recently constructed suite-like hotel quality cabins for members and their guests that will have minimal value while there are still uncertainties about Big Lake. Gunstream expects to lose members because of the costs that will be incurred in restoring Big Lake and it is unclear whether new members will be willing to pay the fees that have heretofore been required to join during a period of such uncertainty.

44. Defendants have compounded their acts and omissions by failing to clean up the dam failure on their property. There are significant amounts of sediment and soils that are not stabilized at the site of the dam and within the channel running from the dam to the Gunstream Property. These materials are being washed downstream into Big Lake, especially during even normal rain events, thereby causing further damage to the Gunstream Property.

**Statutory Notice**

45. In advance of filing this suit, Plaintiffs satisfied their 60-day notice requirements by delivering notice letters to Defendants and the head of the appropriate federal agencies.

46. On July 2, 2021, Gunstream sent a letter to Defendants notifying them of Gunstream's intent to sue under the Clean Water Act and Endangered Species Act and providing them with the requisite 60-day notice (the "Notice Letter"). *See* Exhibit 1. The notice set forth all elements required under the Clean Water Act and Endangered Species Act, including: the specific

standard, limitation, or order alleged to have been violated; the activity alleged to constitute a violation; the persons responsible for the alleged violation; the location of the alleged violation; the approximate dates of the violation; and the full name, address, and telephone number of the party giving notice. *See id*.

47. On July 2, 2021, the Notice Letter was mailed to the U.S. Department of the Interior, U.S. Fish & Wildlife Service, Texas Commission on Environmental Quality, and the U.S. Environmental Protection Agency. *See* Exhibit 1 at 6.

48. On July 29, 2021, the U.S. Army Corps of Engineers, Fort Worth District, sent a cease and desist letter to Defendants (the "USAC Letter"), addressing Defendant's violation of section 301(a) of the Clean Water Act and demanding Defendants "halt any further unauthorized work in waters of the United States, including wetlands." Exhibit 2. The USAC Letter was also directed to the Environmental Protection Agency, U.S. Fish & Wildlife Service, Texas Commission on Environmental Quality, and Texas Parks and Wildlife Department. *Id*. at 2. The USAC Letter does not describe any current intent to pursue administrative penalty claims. *See id*.

49. The statutory 60-day notice period lapsed no later than September 27, 2021, 60 days after the Principal Deputy Director of the Fish & Wildlife Service received the notice letter. All other required recipients received their copy of the notice letter prior to that date. Accordingly, at the time of filing, the notice period has passed.

50. As of the filing date of this Complaint, no agency has diligently pursued an administrative penalty action against Defendants. Upon information and belief, no agency intends to pursue administrative penalties from Defendants.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE FEDERAL CLEAN WATER ACT

51. Gunstream incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

52. As described above, upon information and belief portions of Defendants' Property are within the jurisdiction of the Federal Clean Water Act. Defendants violated the Federal Clean Water Act by failing to perform the requisite study to determine whether they needed to apply for and obtain a 404 permit to construct their dam.

53. In order to construct a dam on land that is within the jurisdiction of the Federal Clean Water Act, Defendants were required to apply for, and obtain, a "404 permit" issued by the U.S. Army Corps of Engineers.

54. Upon information and belief, Defendants never obtained a 404 permit. In fact, upon information and belief, Defendants never applied for a 404 permit.

55. As a direct and proximate cause of the conduct alleged herein, Gunstream sustained damages and other losses in the form of restoration costs, loss of use and diminution in value, in amounts to be determined at trial.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE ENDANGERED SPECIES ACT

56. Gunstream incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

57. As described above, Defendants violated the Endangered Species Act by failing to perform a habitat study, and then failing to obtain approval from the U.S. Fish and Wildlife Service

and the U.S. Environmental Protection Agency prior to constructing the dam on the Defendants' Property.

58. As a direct and proximate cause of the conduct alleged herein, Gunstream sustained damages and other losses in the form of restoration costs, loss of use and diminution in value, in amounts to be determined at trial.

### THIRD CAUSE OF ACTION
### NEGLIGENCE PER SE

59. Gunstream incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

60. Defendants' violations of the Federal Clean Water Act, the Endangered Species Act, and TCEQ's dam safety program, as set forth above, constitute negligence per se.

61. As a direct and proximate cause of the conduct alleged herein, Gunstream sustained damages and other losses in the form of restoration costs, loss of use and diminution in value, in amounts to be determined at trial.

### FOURTH CAUSE OF ACTION
### NEGLIGENCE

62. Gunstream incorporates by reference each preceding and succeeding paragraph as though fully set forth at herein.

63. Defendants owed a duty to properly construct a dam in such a manner that the dam would not fail under normal conditions and would not cause damage to adjacent and downstream property.

64. Defendants' acts and omissions, as described above, breached that duty and constitute negligence.

65. As a direct and proximate cause of the conduct alleged herein, Gunstream sustained damages and other losses in the form of restoration costs, loss of use and diminution in value, in amounts to be determined at trial.

### FIFTH CAUSE OF ACTION
### GROSS NEGLIGENCE

66. Gunstream incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

67. As set forth above, the acts and omissions of Defendants, when viewed objectively from the standpoint of the occurrence in question, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Gunstream.  These acts and omissions were more than momentary thoughtlessness, inadvertence, or error of judgment. Rather, Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.  Such acts and/or omissions were a proximate cause of the injury and damages sustained by Gunstream.

68. As a result of Defendants' gross negligence, Gunstream is entitled to recover not only its actual damages, but also exemplary damages under the Texas Damages Act, Texas Civil Practice and Remedies Code § 41.001 *et seq*.

### SIXTH CAUSE OF ACTION
### TRESPASS TO REAL PROPERTY

69. Gunstream incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

70. A defendant commits a trespass to real property where there is an unauthorized entry upon the land of another, either by a person or by an object.

4817-7889-3049.3

71.     In September 2020, Defendants' conduct, as described above, caused an unauthorized entry of water and debris onto the Gunstream Property. Defendants intended to build a dam on Defendants' Property, and Defendants' actions and inactions to prevent that water and debris from entering the Gunstream Property constituted a trespass.

72.     As a direct and proximate cause of the conduct alleged herein, Gunstream sustained damages and other losses in the form of restoration costs, loss of use and diminution in value, in amounts to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gunstream Land Corporation respectfully requests that this Court:

- A.  declaratory relief finding Defendants violated the Clean Water Act and Endangered Species Act;
- B.  permanently enjoin Defendants from further violation of the Endangered Species Act under 16 U.S.C. § 1540(g)(1)(A) and Clean Water Act under 33 U.S.C. § 1319;
- C.  assess civil and administrative penalties against Defendants as permitted by law;
- D.  award all actual, general, special, incidental, statutory, punitive, exemplary and consequential damages and restitution to which Plaintiff is entitled;
- E.  order remediation, under the direction of the appropriate state and federal agencies;
- F.  award pre-judgment and post-judgment interest on such monetary relief;
- G.  award costs of litigation, including reasonable attorneys' fees and costs; and
- H.  grant such further relief that this Court deems appropriate.

Dated:  November 17, 2021.

                              Respectfully submitted,

                              By: */s/ J. Cary Gray*
                                  J. CARY GRAY
                                  State Bar No. 08322300

                              **GRAY REED**
                              1300 Post Oak Blvd., Suite 2000
                              Houston, Texas  77056
                              Telephone:  (713) 986-7000
                              Facsimile:  (713) 9867100
                              Email:  cgray@grayreed.com

                              ANDREW K. YORK
                              State Bar No. 24051554
                              **GRAY REED**
                              1601 Elm Street, Suite 4600
                              Dallas, Texas  75201
                              Telephone:  (214) 954-4135
                              Facsimile:  (214) 953-1332
                              Email:  dyork@grayreed.com

                              **ATTORNEYS FOR PLAINTIFF**

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

                              */s/ J. Cary Gray*
                              J. CARY GRAY
                              ATTORNEY FOR PLAINTIFF

## NOTICE OF SERVICE

Plaintiff certifies that a copy of this Complaint was mailed the following parties via certified mail, return receipt requested, on November 17, 2021:

Merrick Garland
Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Deb Haaland
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington DC 20240

Amy Lueders, Regional Director
U.S. Fish & Wildlife Service
P.O. Box 1306
Albuquerque, NM 87103-1306

Martha Williams
Principal Deputy Director
U.S. Fish & Wildlife Service
1849 C Street, N.W.
Washington, DC 20240

Earl Lott, MC158
Director, Office of Water
Texas Commission on Environmental Quality
P.O. Box 13087
Austin, TX 79711

Michael S. Regan
Administrator U.S. Environmental Protection Agency
Mail Code 1101A
1200 Pennsylvania Avenue,
N.W. Washington, DC 20460

David W. Gray
Action Regional Administrator
Environmental Protection Agency, Region 6
1201 Elm Street, Suite 500
Dallas, TX 75270

-18-

Additionally, notice was served on the following parties via e-mail:

Marc A Young
Counsel for Defendants
Cokinos Young
Las Cimas IV
900 S. Capital of Texas Hwy., Suite 425
Austin, Texas 78746

Tom Nystrom
EPA Region 6
Water Resources Section
Enforcement and Compliance Assurance Division

Debra Bills
Field Supervisor
U.S. Fish & Wildlife Service

Omar R. Bocanegra
Acting Division Manager
Environmnetal Review
Southwest Region
U.S. & Wildlife Service

David Galindo
Director, Water Quality Division
Texas Commission on Environmental Quality

Tom Heger
Texas Parks and Wildlife Department

*/s/ J. Cary Gray*
J. CARY GRAY
ATTORNEY FOR PLAINTIFF