UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

No. 6:21-cv-00451

**Gunstream Land Corporation,**
*Plaintiff,*

v.

**Hans V. Hansen et al.,**
*Defendants.*

## OPINION AND ORDER

Plaintiff Gunstream Land Corporation sued defendants alleging that a dam's failure harmed and continued to harm plaintiff's fishing preserve by putting sand, sediment, and soil into a stream running into plaintiff's lake. A six-day trial was held on plaintiff's claims of negligence, trespass, and violation of the Clean Water Act (CWA). The jury returned a verdict for plaintiff on the negligence and trespass claims but not the CWA claim. On the state-law claims, the jury awarded $745,000 in compensatory damages and $1,500 in punitive damages.

Gunstream now moves for a new trial on the CWA claim only, arguing that the jury verdict on this claim was against the great weight of the evidence. Docs. 126, 142. For the following reasons, the motion is denied.

**I. Analysis**

"The court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). However, "[a] trial court should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence." *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998). In making this determination, "the district court weighs all of the evidence, and it need not view it in the light most favorable to the nonmoving party." *Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003). But "[t]his does not

mean that a judge may order a new trial simply because he disagrees with the jury verdict." *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982).

Three factors guide the new-trial analysis: "simplicity of the issues, the extent to which the evidence is in dispute, and the absence of any pernicious or undesirable occurrence at trial." *Id*. The great weight of the evidence is a fourth consideration that, standing alone, can support the grant of a new trial even if the other three factors point in the opposite direction. *See Cates v. Creamer*, 431 F.3d 456, 461 (5th Cir. 2005).

Here, although the court might not reach the same verdict were it the trier of fact, the jury's CWA verdict is not against the great weight of the evidence. And plaintiff fails to establish that the other three factors weigh in favor of a new trial.

### A. Complexity of the issues

Plaintiff first argues that the CWA claim is complex and that the verdict should therefore be more closely scrutinized. Doc. 142 at 3–4. Specifically, plaintiff suggests that the CWA is a complicated federal statute with many counterintuitive applications and definitions. *Id*. Although the CWA is undoubtedly a "complex statutory and regulatory scheme," *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994), it does not necessarily follow that the issues in this case were outside the competence of an average jury.

The jury here was instructed to analyze six elements in deciding the CWA claim:

1) the "discharge" of a "pollutant,"
2) by defendants or either of them,
3) from a "point source"
4) into one of the "Waters of the United States,"
5) without a permit allowing that discharge; and
6) Gunstream has an interest that is or may be adversely affected by that discharge.

Doc. 95 at 9. Additionally, all relevant terms were thoroughly defined in the jury instructions. *Id.* at 9–10.

The court does not view the elements of the CWA claim as "unusually complex." *See Scott v. Monsanto Co.*, 868 F.2d 786, 790 (5th Cir. 1989) (concluding that the issue of medical causation with numerous conflicting expert opinions was not complex). Furthermore, absent evidence to the contrary, this court will "presume that the jury heard, understood and followed the [jury] instructions." *United States v. Bernard*, 299 F.3d 467, 476 (5th Cir. 2002) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). In short, the CWA claim in this case is not sufficiently complex to trigger any lessened deference to the jury's verdict.

### B. Weight of the evidence

Plaintiff next argues that the evidence presented at trial clearly demonstrated a violation of the CWA. Doc. 142 at 4. Defendants respond that the jury properly concluded that there was insufficient evidence of an ongoing discharge of pollutants from a point source on the Hansens' property. Docs. 130, 139. In evaluating the arguments, the court is mindful that "[a]gainst the great weight of the evidence is a standard not easily met," *Scott*, 868 F.2d at 789, and that deference should be extended to the jury in its constitutional role as finder of fact. *See Shows*, 671 F.2d at 930 (holding that "[w]hen the trial judge has refused to disturb a jury verdict . . . . [d]eference to the trial judge . . . operates in harmony with deference to the jury's determination of the weight of the evidence and the constitutional allocation to the jury of questions of fact").

In order to succeed on this claim, Gunstream was required to show by a preponderance of the evidence an ongoing violation—that, on or after the date the claim was filed, there was at least one instance of a discharge of pollutants without a permit from a "point source" on the Hansens' property into waters of the United States. Doc. 95 at 9.

Gunstream did present testimony concerning the relative turbidity (the amount of sediment in the water) of the stream flowing

from the failed dam by comparing it to a reference stream. According to that testimony, the turbidity in both the dam and reference streams on days without precipitation was comparable and "very low." Doc. 136 at 81. However, on rainy days, the turbidity, while increasing for both streams, would be significantly higher in the dam stream. *Id.* at 87. According to Dr. Olson, an expert proffered by Gunstream, that differential was caused by erosion at the site of the failed dam. *Id.* He specifically pointed to "small valleys" on the hillsides by the dam site as "indications . . . of real erosion." *Id.* at 58. Dr. Olson also "speculat[ed] a bit" that a silt barrier installed at the dam site was most likely experiencing overflow during significant rain events. *Id.* at 63–64.

The jury was free to weigh this testimony and conclude that it failed to establish ongoing discharges from a "point source" by a preponderance of the evidence. *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 273 (5th Cir. 1998) ("It is within the province of the jury to decide how much weight to give [to] expert testimony . . . ."). For one, the testimony does not absolutely preclude a reasonable jury from concluding that some undefined amount of turbidity in the dam stream is originating from sources other than the dam site. There was significant testimony that the surrounding area is sandy, Docs. 134 at 140; 135 at 134–35, 165; 137 at 35–36, and that sandy soil is susceptible to erosion, Doc. 136 at 59. The accuracy of the turbidity readings was also challenged on cross-examination. Doc. 137 at 56–58.

Moreover, the evidence allowed the jury to independently conclude that any sediment coming from the general area of the former dam site was not coming from any one place discrete and confined enough to qualify as a "point source." As the jury instructions explain, a point source is "any discernable, confined, and discrete conveyance. The term includes, but is not limited to, any channel, ditch, pipe, or conduit from which pollutants are or may be discharged." Doc. 95 at 10 (paraphrasing 33 U.S.C. § 1362(14)).

The Fifth Circuit "has specifically rejected an expansive definition of 'point source.'" *Hamker v. Diamond Shamrock Chem. Co.*, 756 F.2d 392, 397 (5th Cir. 1985).

> Plaintiff would merely require a showing of the original sources of the pollution to find a statutory point source, regardless of how the pollutant found its way from that original source to the waterway. According to this argument, the broad drainage of rainwater carrying oily pollutants from a road parallelling a waterway, or animal pollutants from a grazing field contiguous to the waterway, would violate the Act. Whether or not the law should prohibit such pollution, this Act does not. The focus of this Act is on the "discernible, confined and discrete" conveyance of the pollutant, *which would exclude natural rainfall drainage over a broad area*.

*Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 44 (5th Cir. 1980) (emphasis added); *see also United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 647 (2d. Cir. 1993) (reasoning that "point source" acts as a limitation on the scope of the CWA by clarifying the act's focus on industrial polluters).

Thus, in *Hamker*, the Fifth Circuit held that ongoing effects of a one-time leak from an oil pipe, which had been arguably worsened by remediation efforts, did not constitute "a continuing discharge from a point source." 756 F.2d at 397. The Fifth Circuit reasoned that "[m]ere continuing residual effects resulting from a discharge are not equivalent to a continuing discharge." *Id.* Conversely, in *Sierra Club*, the Fifth Circuit determined that there could be a point source discharge where miners had channeled rainwater runoff from strip mining "spoil piles." 620 F.2d at 45.

Plaintiff attempts to analogize to *Sierra Club*, arguing that a "point source" exists here because the "the dam stream follows in a channel" and the dam site itself is a "settlement basin" subject to erosion during rain events. Doc. 142 at 12. But *Sierra Club*'s conclusion that "[g]ravity flow, resulting in a discharge" could be a point source was predicated on a potential finding that the

miners "initially collected or channeled the water and other materials." 620 F.2d at 45. Similarly, "discharges . . . by means of ditches, gullies and similar conveyances" could be viewed as a point source precisely because such runoff came from spoil piles designed by the miners. *Id.*

Here, the evidence was ambiguous enough to allow the jury to find that sediment was entering the stream through the broad drainage of rainwater carrying sediment from the general area contiguous to the stream. There was no great weight of the evidence showing that defendants created confined and discrete channels or gullies carrying sand into the stream, as opposed to owning a large, sandy area over which rainwater broadly drained.

Additionally, the mere fact that the navigable water (the stream) itself flows through a channel is insufficient to establish a point source. To hold otherwise would be to nullify the "point source" element entirely, since every stream or river necessarily runs through some form of channel. In short, the jury did not act against the great weight of the evidence in concluding that the facts here establish only "[s]imple erosion over the material surface" which "does not constitute a point source discharge." *Id.* at 44–45; *Trs. for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir. 1984) ("Congress [has] classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants.") (citing *United States v. Earth Scis., Inc.*, 599 F.2d 368 (10th Cir. 1979).

Plaintiff also suggests that the "earth-moving equipment" used by defendant to reconstruct and then ultimately remove the failed dam also constitutes a point source. Doc. 142 at 11–12. As an initial matter, the court notes that the reconstruction and removal of the dam appear to have taken place no later than the summer of 2021. Docs. 134 at 97; 136 at 24. Thus, the record and testimony fail to establish by a great weight of the evidence that equipment was used or present at the dam site on or after November 17, 2021. It was plaintiff's burden to show an ongoing violation as of this date. Doc. 95 at 9.

Plaintiffs point to the Fifth Circuit's holding that "bulldozers and backhoes" can constitute a point source. Doc. 142 at 11 (citing *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 922 (5th Cir. 1983)). However, the Fifth Circuit came to this conclusion because the equipment at issue "collected into windrows and piles material that may ultimately have found its way back into the waters." *Avoyelles*, 715 F.2d at 922. The evidence here does not establish by a great weight of the evidence that the equipment was used by defendants to create deposits of waste material that continue to discharge pollutants.

In conclusion, although the evidence might allow for conflicting views about where exactly the turbidity entering plaintiff's property came from, that merely created room for jury factfinding—not the need for a new trial. Like the oil spill in *Hamker*, defendants' dam failure is a catastrophic event followed by remedial measures—removal of the rebuilt dam—that, though possibly causing continuing residual effects through erosion, does not indisputable constitute a point source to the level of certainty requiring a new trial or judgment as a matter of law in plaintiff's favor. 756 F.2d at 397. The jury could have reasonably concluded that plaintiff failed to establish the existence of "any discernible, confined and discrete conveyance" of a pollutant discharge into the dam stream. 33 U.S.C. § 1362(14).

### C. Pernicious occurrences

As a short, final argument, plaintiff suggests that pernicious occurrences marred the trial. Plaintiff accuses defendant's counsel of suggesting that plaintiff was abusing the CWA, that the CWA required more proof than it actually did, and that the CWA "infringed on Texas custom and property owners' rights." Doc. 142 at 13. However, the episodes cited by plaintiff were of short duration. More importantly, as plaintiff acknowledges, the court issued curative instructions "both contemporaneously and in the final jury instructions." *Id*. Defendant's counsel undisputedly crossed the professional line. But the court has no doubt that the jury understood the court's admonitions when he did so.

As stated previously, this court will "presume that the jury heard, understood and followed the [jury] instructions." *Bernard*, 299 F.3d at 476. Particularly in light of this court's determination that the evidence does not require a new trial, there is no indication of prejudice even though some of defendant counsel's comments were improper or legally incorrect.

## II. Conclusion

Plaintiff's motion for a new trial (Docs. 126, 142) is denied.

*So ordered by the court on March 26, 2025.*

J. CAMPBELL BARKER
United States District Judge